**STATE of Minnesota, Respondent,**

v.

**Bradly Richard SIRVIO, Appellant.**

No. C9–97–412.

Supreme Court of Minnesota.

May 21, 1998.

John M. Stuart, State Public Defender, Susan K. Maki, Assistant State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey III, Attorney General, Paul R. Kempainen, Assistant Attorney General, St. Paul, for respondent.

Michael Jesse, Benton County Attorney, Foley, for respondent.

## OPINION

TOMLJANOVICH, Justice.

Bradly Richard Sirvio appeals his conviction of first-degree premeditated murder and other offenses arising from the death of George Schlegel on November 2, 1995. Sirvio, who is serving a term of life in prison, argues that the trial court prejudicially erred in denying his pretrial motion to suppress incriminating statements he made to police on November 3, 1995, after he voluntarily admitted himself to a detoxification center and volunteered to a staff member during the intake process that he may have murdered someone named George and then set the house on fire to cover up what he had done. Concluding that the trial court did not

err in denying the motion to suppress, we affirm Sirvio's conviction.

The victim in this case was George Schlegel, a 55–year–old man who was living in an old house in rural Foley in Benton County. Schlegel was living in the house rent-free in return for watching the place for the owner. Early on November 2, 1995, a passerby summoned the local fire department to the burning house. At first the firefighters attempted to douse the blaze, and they searched for occupants in the one small section of the house that was not engulfed in flames. However, the owner arrived on the scene and told them that if Schlegel's car was not in front of the house, then no one was inside. Thus, the firefighters abandoned their efforts to search for occupants.

Later that day, at about noon, Sirvio was stopped in Sherburne County driving Schlegel's automobile. The state trooper who stopped Sirvio impounded the automobile and arrested him for driving after cancellation. Sirvio, who was 24 years old and homeless, was released in St. Cloud.

At about 1 a.m. on November 3, Sirvio approached a St. Cloud police officer on the street near a downtown bar and asked to be taken to the St. Cloud Detoxification Center. There Sirvio voluntarily "signed himself in." One of the intake workers, who knew him from his previous stays at the detoxification center, did not believe Sirvio was as intoxicated as he had been on prior occasions.

The intake process includes taking and washing the clothing of the intoxicated person for cleanliness purposes. While Sirvio was emptying his pockets, he happened upon the traffic ticket he had received earlier that day. Sirvio said to one of the employees that "he would be doing alot [sic] of time soon" and began to sob. The worker asked if it was about the traffic ticket, and Sirvio said no, that it was worse. He then asked if it would still be confidential if he said he killed or murdered someone. The employee said she did not know but that calling the police "was something that had to be done." Sirvio continued by saying that he had met someone named George at Tom's Bar in St. Cloud, that he had gone to George's house somewhere between Foley and St. Cloud, and that

he had hit George in the head with a hammer numerous times. He also said that he had burned down the house to cover up what he had done and that he had stolen George's car and money.

Two St. Cloud police officers responded to the call from the detoxification center employee concerning Sirvio's confession. These officers sat down with Sirvio an open dining area and told him that they had heard he wanted to speak with them. Sirvio said that he did, and he proceeded to tell the officers what he had already told the employees about murdering George and burning his house. One of the officers surreptitiously recorded Sirvio's confession with a portable tape recorder. The officers then contacted the Benton County sheriff's office and informed them of Sirvio's confession. A detective from that office arrived at the detoxification center at around 2:30 a.m. He found Sirvio in a smoking room, where he turned on his tape recorder and read Sirvio his *Miranda* rights. The detective questioned Sirvio in the smoking room for about one hour. Sirvio told the detective substantially the same story that he had told the St. Cloud police officers, although he added a few details.

Later that day, after Sirvio was arrested and jailed, the detective again informed him of his *Miranda* rights on a written waiver form, which Sirvio signed. The detective took another recorded statement from Sirvio at that time. A day later, on the afternoon of November 4, Sirvio reviewed and signed a transcribed copy of his first statement to the detective, the one made at the detoxification center.

At the pretrial suppression hearing, Sirvio challenged the admissibility of all of his statements to the police but not his incriminating statements to the workers at the detoxification center. Further, Sirvio did not challenge the admissibility of incriminating statements he made before going to the detoxification center, specifically, statements he made at a bar after being stopped for driving after cancellation and statements he made in telephone calls to his mother and his aunt. Nor, obviously, did Sirvio seek suppression of

the evidence that the body found in the burned house was that of Schlegel, the expert testimony that the cause of death was "homicidal violence," or the evidence that the fire that destroyed the house had been intentionally set.

Sirvio's first contention, that the interrogation of him at the detoxification center by the St. Cloud police officers was custodial in nature and that therefore the officers should have given him a *Miranda* warning, is without merit. The test of custody is an objective test that uses the perspective of a reasonable person in the suspect's position. *See Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984). The inquiry for the court is whether, under all the circumstances, "there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994) (per curiam) (internal quotation omitted). The mere fact that the interrogation occurs at a police station does not require a determination that the questioning was custodial in nature. *See, e.g., California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam) (holding that a suspect is not in custody simply because the questioning occurred at the police station or because the person questioned was a prime suspect); *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam) (holding that *Miranda* warning was not required when a parolee voluntarily submitted to questioning at a state patrol office even though the questioning by the officer occurred in a room with the door closed). On the other hand, the mere fact that questioning occurs in a suspect's house does not mean that the questioning is not custodial in nature. *Compare Beckwith v. United States,* 425 U.S. 341, 345–47, 96 S.Ct. 1612, 1615–17, 48 L.Ed.2d 1 (1976) (holding that a *Miranda* warning was not required when IRS agents conducted an interview of a taxpayer in a home where he occasionally stayed), *with Orozco v. Texas,* 394 U.S. 324, 325–26, 89 S.Ct. 1095, 1096–97, 22 L.Ed.2d 311 (1969) (holding that a *Miranda* warning was required when several police officers questioned a suspect in his bedroom at 4 a.m.). Other relevant cases include *Berkemer,* 468 U.S. at 440, 104 S.Ct. at 3150, holding that a person temporarily detained pursuant to a routine traffic stop was not in custody, and *Minnesota v. Murphy,* 465 U.S. 420, 430, 104 S.Ct. 1136, 1143, 79 L.Ed.2d 409 (1984), holding that a routine but required meeting between an individual and the individual's probation officer was not custodial in nature. These cases make clear that the mere fact that there are "coercive aspects" to the interrogation does not mean that the interrogation necessarily is custodial, because "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714.

With the above caselaw in mind, we conclude without hesitation that, considering all the relevant circumstances, no reasonable person in Sirvio's position would have concluded that "there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest" at the time the police officers questioned him. *Stansbury,* 511 U.S. at 322, 114 S.Ct. at 1529 (internal quotation omitted). Sirvio, having already confessed to others, signed himself in to the detoxification center and confessed to detoxification center workers. The questioning of Sirvio by the police officers occurred primarily in the detoxification center's dining area. Sirvio sat on a couch, and the officers sat at a table 10 to 15 feet away. The doors to the room remained open. The officers did not tell Sirvio he was under arrest, nor did they restrain him in any way. They allowed him to smoke in a smoking room when he wished. They made no threats or promises to him. Sirvio made no effort to leave, and the officers did not tell him he was not free to leave. The fact that the officers knew that Sirvio had already confessed to the detoxification center workers did not convert what otherwise was a noncustodial interrogation into a custodial interrogation. *See State v. Champion,* 533 N.W.2d 40, 43–44 (Minn. 1995). Nor did anything happen during the

course of the interrogation that would have led a reasonable person under the circumstances to believe that he or she was in police custody of the degree associated with formal arrest. *See id.; cf. State v. Rosse,* 478 N.W.2d 482, 486 (Minn.1991).

Our only concern with the interrogation of Sirvio by the detective from the Benton County sheriff's office relates to the fact that the detective supplemented the *Miranda* warning with a statement that the reading of the warning was "[j]ust a technicality." However, we need not and do not address this serious issue because it is clear that that interrogation was also a noncustodial interrogation, for the same reasons that the interrogation by the police officers was a noncustodial interrogation, and therefore no *Miranda* warning was needed.

Sirvio's final claim relating to the admissibility of his incriminating statements is that they were "involuntary." Our decision in *State v. Williams,* 535 N.W.2d 277, 286–88 (Minn.1995), summarizes the relevant caselaw dealing with the issue of the voluntariness of a waiver of *Miranda* rights and with the issue of the voluntariness of a confession. We do not believe that any useful purpose would be served by addressing Sirvio's claims in this regard in any detail. It is sufficient, in our opinion, to say that there is no merit whatever to Sirvio's claims. Sirvio rather obviously was in a confessing frame of mind, since he confessed to a number of people at a bar, as well as to his mother and his aunt, before he volunteered to the detoxification center's workers that he had killed someone. In *Colorado v. Spring,* 479 U.S. 564, 573–74, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987), the United States Supreme Court stated that a confession will not be ruled involuntary absent evidence that the suspect's will was overborne and his or her capacity for self-determination critically impaired by coercive police conduct. Similarly, in *Colorado v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986), the Court stated that all of the involuntariness cases "have contained a substantial element of coercive police conduct." Our decisions are in accord. *See Williams,* 535 N.W.2d at 287–88; *State v. Moorman,* 505 N.W.2d 593,

600 (Minn.1993); *cf. State v. Garner,* 294 N.W.2d 725, 727 (Minn.1980). There is no evidence of police overreaching or coercive conduct in this case.

In summary, we reject Sirvio's contention that the trial court erred in denying his motion to suppress his incriminating statements to the police officers and to the detective. In view of our holding, there is no need to address the issue of whether any error in admitting some of the Sirvio's incriminating statements, had there been error, would have been harmless beyond a reasonable doubt.

Affirmed.

GILBERT, J., took no part in the consideration or decision of this case.